**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **Luminati Networks Ltd.,** | |
| **Plaintiff,** | **Civil Action No.** |
| | **2:18-cv-00299-JRG** |
| **v.** | |
| **UAB Tesonet,** | |
| **Defendant.** | |

**DEFENDANT'S RESPONSIVE**
<u>**CLAIM CONSTRUCTION BRIEF**</u>

## **TABLE OF CONTENTS**

I.   Introduction ........................................................................................................... 1

II.  '044 Patent Independent Claim Terms and Indefiniteness ................................... 1

    A.   Preamble (Br. § VI.A.) .................................................................................. 1

    B.   The claim terms "from a second server," "by a first device," "via a second device," and "using a first server" are indefinite (Br. § VII.A) ................ 4

        1.   "From a second server" (Br. § VII.A) ................................................ 7

        2.   "By a first device" / "Using a first server" (Br. § VII.A) ................. 8

        3.   "Via a second device" (Br. § VII.A) ................................................. 9

    C.   "Device" ('044 and '866 Patents) (Br. § VI.B) ......................................... 10

    D.   "Content" ('044 and '866 Patents) (Br. § VI.D) ........................................ 10

    E.   "Identifier" ('044 and '866 Patents) (Br. § VI.C) ..................................... 11

    F.   "Content identifier" (Br. § VI.E) ............................................................... 13

III. '866 Patent Independent Claim Terms and Indefiniteness ................................. 14

    A.   "Content slice" / "Partitioning" (Br. §§ VI.J, VI.L) ................................. 14

    B.   "Constructing" (Br. § VI.M) ...................................................................... 19

    C.   "Client device" (Br. § VI.N) ...................................................................... 20

    D.   The claim terms "partitioning the content" and "constructing the content" are indefinite (Br. § VII.C) ....................................................................... 22

    E.   "Group device identifier" / "Content slice identifier" (Br. §§ VI.I, VI.K) ................. 23

IV.  Dependent Claim Terms and Indefiniteness ...................................................... 23

    A.   The claim term "past activities" is indefinite (Br. §§ VI.G, VII.B) ........... 23

    B.   "The timing of an event" ('044 Patent) (Br. § VI.H) ................................. 24

    C.   "Simultaneous" / "Concurrently" ('044 Patent) (Br. § VI.F) .................... 25

        1.   "Simultaneous" (Br. § VI.F) ............................................................ 25

        2.   "Concurrently" (Br. § VI.F) ............................................................. 26

    D.   "Part of the content included in two or more content slices" ('866 Patent) (Br. § VI.O) ................................................................................. 28

V.   Terms Subject to Teso's Motion for Leave ........................................................ 28

    A.   Limiting Preamble as to Claim 108 ............................................................ 28

    B.   Indefiniteness of "from a second server," "by a first device," "via a second device," and "using a first server" for Claim 108 ........................... 28

    C.   "Sending a first request" ............................................................................. 29

VI.  Conclusion .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006)......................................................................................3

*Blue Calypso, Inc. v. Groupon, Inc.*,
   93 F. Supp. 3d 575, 594 (E.D. Tex. 2015).................................................................4

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002)......................................................................................3

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004)....................................................................................6

*Eaton Corp. v. Rockwell Int'l Corp.*,
   323 F.3d 1332 (Fed. Cir. 2003)....................................................................................2

*Mobile Telecommunications Techs., LLC v. Google Inc.*,
   2:16-CV-2-JRG-RSP, 2016 WL 7338398 (E.D. Tex. Dec. 19, 2016) ......................2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014).......................................................................................1, 4, 8, 10

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
   739 F.3d 1367 (Fed. Cir. 2014)................................................................................2, 3

*Seachange Int'l, Inc. v. C-COR, Inc.*,
   413 F.3d 1361 (Fed. Cir. 2005)..................................................................................28

Defendant UAB Teso LT files this Responsive Claim Construction Brief to Plaintiff Luminati Networks Ltd.'s Opening Claim Construction Brief ("Br.") (ECF No. 61):

## I.      INTRODUCTION

Luminati depicts its alleged inventions as "a new method for fetching content from a target server over the Internet using intermediary third-party residential devices, such as an individual's cell phone, in order to make the request from the third-party instead of the original requestor." Br. at 1; ECF No. 60-1 (Tutorial) at 10. Similarly, Luminati's expert argues against indefiniteness by referencing a patent figure showing, step by step, the series of sending and receiving of communications between the user (client device), a server, a third-party intermediary (tunnel device), and the target server to fetch the content. ECF No. 61-1 (Rhyne Decl.), ¶ 9 (referencing Fig. 5b).

The problem is that Luminati failed to *claim* this in the asserted claims. Instead, it drafted ambiguous claims that do not identify how the devices or servers must perform the "sending" and "receiving" steps of its claims or otherwise define the relationship of the devices and servers. Further, Luminati added limitations into its claim preambles requiring that the fetching of content be "by," "from," "via," or "using" certain devices, without saying exactly which steps the devices must perform or the relationships of the devices. The result is a jumbled mess that serves as a textbook example of what the Supreme Court warned against in *Nautilus*. Teso explains below why Luminati's claims are indefinite and addresses the disputed claim constructions.

## II.     '044 PATENT INDEPENDENT CLAIM TERMS AND INDEFINITENESS

### A.      Preamble (Br. § VI.A.)

Claim 81's preamble does not merely "state a purpose or intended use" of the alleged invention. Instead, it limits the claims by (i) providing antecedent basis for seven terms that follow the preamble and (ii) providing express definition of the claimed subject matter that—even according to Luminati's own expert—provides important guidance to a person of ordinary skill.

*First*, it is well established that "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *See, e.g.*, *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). Claim 81's preamble provides antecedent basis for all of the following terms in steps (a)-(e): "**the** first identifier," "**the** first server," "**the** second identifier," "**the** second device," "**the** first content identifier," "**the** third identifier," and "**the** first content."[1] Each of these seven terms find its antecedent in the preamble, which initially introduces each term with an "a" article. This makes the preamble limiting. *See, e.g.*, *Mobile Telecommunications Techs., LLC v. Google Inc.*, 2:16-CV-2-JRG-RSP, 2016 WL 7338398, at *17 (E.D. Tex. Dec. 19, 2016) ("Because the body of Claim 5 relies upon the preamble for antecedent basis for 'mobile transceiver,' 'network,' and 'registration signals,' the preamble is limiting.").

Luminati's primary response is to mischaracterize the Federal Circuit's decision in *Proveris* as allegedly holding that a preamble with antecedent basis "***may*** be limiting, but only to the extent the term is 'defined in greater detail in the preamble.'" Br. at 8 (citing *Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014)) (emphasis in brief). Luminati asserts—without citation—that otherwise "usage in the preamble does not add anything to the claim and the preamble is not limiting." *Id.* at 8-9. *Proveris* found a preamble to be limiting, in part, because "[t]he phrase 'the image data' clearly derives antecedent basis from the 'image data' that is defined in greater detail in the preamble as being 'representative of at least one sequential set of images of a spray plume.'" *Proveris*, 739 F.3d at 1373. *Proveris* did not enact a new rule that a preamble is limiting "only to the extent" it provides greater detail about the antecedent. Regardless, as discussed immediately below, Claim 81's preamble does provide more detail—in

---

[1] All emphases in quotations have been added throughout this brief, unless otherwise indicated.

fact, the only detail in the claim—regarding several antecedents.

*Second*, a preamble is also limiting if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim. *Proveris*, 739 F.3d at 1372. Claim 81 is limiting for this second reason as well, and one need look no further than the statements that Luminati and its expert, Dr. Rhyne, made to try to save Claim 81 from indefiniteness. Dr. Rhyne argued that the preamble "informs a POSA how the first device relates to the other elements of the claim as the claimed method is performed," and that "[t]he claim language clearly distinguishes between the 'first device,' the 'second device,' the 'first server,' and the 'second server.'" Rhyne Decl., ¶ 8. And Luminati goes so far as to argue that "[t]he preamble of claim 81 identifies each of the first and second devices, and first and second servers, as well as the role they play in the fetching of content." Br. at 28.

These admissions about the importance of the preamble are telling, especially because two of the key preamble terms which Luminati alleges are fully explained—"first device" and "second server"—are **found only in the preamble, and nowhere else in Claim 81**. The preamble further provides detail found nowhere else in the claim, including but not limited to (i) the first content being identified by a first content identifier, (ii) the first device being identified in the Internet by a first identifier, (iii) the second server being identified in the Internet by a third identifier, and (iv) a second device being identified in the Internet by a second identifier. The claim body here cannot be said to define a "structurally complete invention" without the preamble. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002).

This is a clear-cut issue. The preamble is limiting here because it provides antecedent basis for other claim terms and because the preamble otherwise defines the claimed invention. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) ("if the claim drafter 'chooses to

use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects'") (emphasis in original).[2]

## B.   The claim terms "from a second server," "by a first device," "via a second device," and "using a first server" are indefinite (Br. § VII.A)

Teso must first address an important error of law found in Luminati's brief. Luminati advises this Court—twice—that "[o]nly claims 'not amenable to construction or insolubly ambiguous are indefinite.'" Br. at 26, 27. This is incorrect. Luminati's proposed standard has not been the law in over five years, because the Supreme Court expressly rejected the "amenable to construction" and "insolubly ambiguous" tests in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Instead, the Supreme Court held that the claims, read in light of the specification and prosecution history, must inform a person of skill in the art of the scope of the invention with reasonable certainty. *Id.* The Court should find the terms noted below indefinite because they fail to define the scope of the invention with reasonable certainty.[3]

Under the correct standard, Claim 81[4] of the '044 Patent is a textbook example of an indefinite claim. It announces important limitations on the scope of the claim through its recitation in the preamble that the fetching of content must be (i) "by a first device," (ii) "from a second server," (iii) "via a second device," and (iv) "using a first server." The problem is that the patentee,

---

[2] Luminati argues that the *entire* preamble is not necessarily limiting. Br. at 9. The only possible question here is as to the opening phrase, "[a] method for fetching over the Internet." But the verb "fetching" necessarily modifies several limiting terms in the preamble, including "a first content" which provides an antecedent basis. *See Blue Calypso, Inc. v. Groupon, Inc.*, 93 F. Supp. 3d 575, 594 (E.D. Tex. 2015) (preamble could not be parsed into limiting and non-limiting portions).

[3] Luminati's statement that Teso has not asserted that "any of the following [indefiniteness] terms lack meaning" does not make sense. Br. at 28. Teso asserts that each identified term is indefinite because it fails to define the scope of the invention with reasonable certainty.

[4] Teso has also sought leave to address the indefiniteness of Claim 108 because it includes the identical preamble and indefinite claim terms. Subject to its motion for leave, Teso includes discussion on Claim 108 below at §§ V.A. and B.

in an apparent attempt to achieve broad and malleable claim coverage, never identified the devices or servers involved with each of the "sending" or "receiving" steps of claim elements (a)-(e) or specified how the devices relate for purposes of those steps. This fails to inform a POSA about the scope of the invention with reasonable certainty. *See* Freedman Decl., ¶¶ 13-18. While the indefiniteness of any one of the four terms above would doom Claim 81, all four terms are indefinite.[5]

The indefiniteness of Claim 81 is best illustrated through an admission by Luminati's own expert, Dr. Rhyne. Dr. Rhyne first asserts that the claim "clearly distinguishes between the 'first device,' the 'second device,' the 'first server,' and the 'second server.'" Rhyne Decl., ¶ 8. He then explains how a POSA might "understand the relationship between the cited first device and other elements of claim 81 and the claims which depend from it." *Id.* at ¶ 9. To illustrate, Dr. Rhyne depicts Figure 5b in his declaration, and identifies the "ACCELERATION SERVER" as the "first server," the "DATA SERVER" as the "second server," the "CLIENT DEVICE" as the "first device," and the "TUNNEL DEVICE" as the "second device." *Id.*

Dr. Rhyne's Figure 5b shows exactly which devices/servers allegedly perform each sending or receiving step listed in Claim 81. The "first device" sends a request to, and receives information from, the "first server." The "first device" sends a content request to the "second device," at which point the "second device" sends a content request to the "second server." The "second server" then sends the content to the "second device," which sends the content back to the requesting "first device." *Id.* Teso re-illustrates Dr. Rhyne's figure below to show the devices of Claim 81 and the steps they allegedly perform, where the **red** letters/arrows (a)-(e) represent steps (a)-(e)

---

[5] Claim 81 is therefore invalid for indefiniteness, as are claims 82-107 which depend from claim 81, because each dependent claim incorporates the same indefinite claim terms and does not include language that resolves the indefiniteness.

of Claim 81, and the additional (unclaimed) steps with the "second server" are also shown in

**green**:



**FIG. 5b**

The problem is that this diagram is not in Claim 81. A court, a litigant, or a POSA could

spend days reviewing Claim 81, along with the written description, without having any degree of

certainty—much less reasonable certainty—about how the steps are performed. As explained be-

low, there are numerous permutations that could potentially be claimed, yet are different from the

figure. This is especially true where **the patent states that a client may function as a server, and**

**vice versa**. '044 Pat. at 116:34-36, 116:64-67. The only way to add any degree of certainty to the

claim is for the Court to re-write the claim, but this is impermissible. *See Chef Am., Inc. v. Lamb-*

*Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[C]ourts may not redraft claims, whether to

make them operable or to sustain their validity."). While claims can always be somewhat more precise, this is a case where the claims have gaping holes that cannot be judicially fixed.

1. <u>"From a second server" (Br. § VII.A)</u>

Dr. Rhyne's figure above shows that the "second server" (target/data server) receives the content request from the "second device" and sends the content to the "second device," which sends the content to the "first device" which requested the content. This apparently is the point of Luminati's alleged invention. Luminati says that its "inventions essentially created **a new method for fetching content from a target server** over the Internet using intermediary third-party residential devices, such as an individual's cell phone, in order to make the request from the third-party instead of the original requestor." Br. at 1. And Luminati's technology tutorial emphasizes the same point. ECF No. 60-1 at 10 ("To solve this problem, the requestor can send the request to a proxy device (tunnel), which can then send the request to the target server.").

Despite all of its emphasis on this point, Luminati did not recite any of those steps with respect to the "second server" in Claim 81 other than to say in the preamble that the first content must be fetched "from a second server." But "second server" is never again recited in Claim 81. There is no definition in the claim as to how to obtain data from the "second server" in order to satisfy the claim. One can discern from the claim that a request for the first content is sent to the "second device," and that the first content is then received by an unnamed actor from the "second device." But if the "second server" is asked for or provides the first content, then *at least* two steps are missing from the method. Further, the specification offers overlapping and competing methods for retrieving content from a server or for providing content from the second server. *Compare* Fig. 5b *with* Fig. 7b and/or Fig. 11c; *see* Freedman Decl., ¶ 17.

This leaves multiple questions about what Claim 81 means by "from a second server."

Does the "second device" need to receive the content from the "second server" in order to practice the claim? If the "first device" obtained the content from the "second server," would that practice the claim? If the "first server" obtained the content from the "second server," would that practice the claim? If the "second device," "first server," or "first device" had the content from the "second server" stored in cache or memory from a previous encounter, would that practice the claim?

These are crucial questions, with no answers. The Court could, in theory, solve these problems by guessing at the intended claim scope and adding multiple express limitations to Claim 81, per Dr. Rhyne's explanation. But, as noted above, the Court cannot rewrite the claims to save them from indefiniteness. Luminati knew how to draft a claim identifying the actions of the sending and receiving devices. *See* '044 Patent Claim 1. Its decision to use amorphous language to leave options open as to claim scope was deliberate, and Luminati alone is responsible for that strategic decision. *See Nautilus*, 572 U.S. at 909 (claims must provide "clear notice of what is claimed, thereby appris[ing] the public of what is still open to them") (internal quotations omitted).

### 2. "By a first device" / "Using a first server" (Br. § VII.A)

Claim 81 makes clear that the first content must be fetched "by a first device." But, like "second server," the "first device" is never recited again in the claim. Luminati's expert believes that claim language "informs a POSA how the first device relates to the other elements of the claim as the claimed method is performed." Rhyne Decl., ¶ 8. Dr. Rhyne's figure makes clear that "by a first device" means that the first device is the actor for *each* sending and receiving step.

The Court could rewrite the claim to clarify that the first device must be the actor for each of the sending and receiving steps, per Dr. Rhyne's inherent suggestion. But it is not the only solution, nor is it the only reasonable solution, and again the Court cannot do the patentees' work of drafting claims to provide reasonable notice of the scope of the clams. Freedman Decl., ¶ 16.

Luminati's claims further lack clarity regarding "from a first device" because the preamble additionally modifies the claims with the limitation "using a first server." The reader of the claim thus knows that the first server must be "us[ed]" in the fetching of content but is provided **no indication of how the first server must be used** to satisfy the claim. Again referring to Dr. Rhyne's figure, and its depiction above, one can see that the "first server" is shown as being the recipient of the sending claimed in steps (a) and (b), and the actor in step (c). But the first server is not shown as being "used" for method steps (d) and (e)—the only actors shown for those steps are the first device and second device. Given the ambiguity of the claim language, does Luminati therefore concede that the first server is *not* used in the sending or receiving of steps (d) and (e)?

The end result is that a POSA cannot reasonably determine which claim steps are performed "by a first device" and which must be performed "using a first server," either alone or potentially in combination with another device, and so cannot determine the scope of the claim.

### 3.   <u>"Via a second device" (Br. § VII.A)</u>

The preamble makes clear that the first content must be received "via a second device." Dr. Rhyne's figure asserts that the "second device" is used in four communications relevant to Claim 81: (i) when it receives the second request from the first device (claim step (d)); (ii) when it sends a request for first content to the second server (not claimed); (iii) when the second server sends the first content to the second device (not claimed); and (iv) when the second device sends the first content to the first device (claim step (e)). The problem is that only (i) and (iv) are represented in the claim. The second device's sending of a request and receiving of content from the second server **are not claimed**. Claim step (e) simply states that the second device sends the first content to an unidentified device, without saying how the second device happened to obtain the first content. *See* Freedman Decl., ¶ 18.

9

What does it mean for the first content to be received "via a second device"? Does the second device need to obtain the first content from the second server, per Dr. Rhyne's figure and Luminati's description of inventiveness? Given that the first content must ultimately come from the second server (target server), could the second device store the first data in cache from an earlier session, even though this is not claimed, and still satisfy the claim? Could the second device contact another device or server—other than the second server—and obtain the first content? There are many such unanswered questions, rendering the term indefinite under *Nautilus*.

### C.      "Device" ('044 and '866 Patents) (Br. § VI.B)

The dispute is whether "device" should be given a plain and ordinary meaning as Luminati proposes, or construed as "a physical computer" as Teso proposes. The primary purpose of Teso's proposed construction is to ensure the "physical" nature of a device. In its brief, Luminati clarifies that a device "is not hypothetical or virtual." Br. at 10. Accordingly, Teso will agree that a "device" may be so construed in order to streamline the issues before the Court. Teso therefore proposes that "device" be construed as "a physical device, but not a hypothetical or virtual device."

### D.      "Content" ('044 and '866 Patents) (Br. § VI.D)

Upon review of Luminati's opening brief, Teso has supplemented its proposed construction to more directly address the apparent dispute. The definition of "content" that Luminati empha-sizes in its brief—a snippet taken out of an out-of-context extrinsic definition—is flawed. Through this snippet, Luminati effectively asks that the Court permit "content" to mean *both* the content itself and *also* (or alternatively) "the information conveyed by" that content. *See* Br. at 14 (quoting, incompletely, an ITU-T definition set forth in Br. Ex. D). The correct definition of "content" may be drawn directly from the specification without the need for extrinsic evidence:

> **The content may include** files, text, numbers, audio, voice, multimedia, video, images, music, computer programs or any other sequence of instructions, **as well as any other form of information represented as a string of bits or bytes**. In one

example, the content may include, be a part of, or a whole of, a website page."
'044 Patent at 51:54-59; '866 Patent at 53:2-7.

A "content," then, is simply this: "files, text, numbers, audio, voice, multimedia, video, images, music, website page, or computer programs or any other sequence of instructions, as well as any other form of information represented as a string of bits or bytes." Teso's definition is consistent with the specification—which does not expressly define "content" but includes (as Luminati notes, Br. at 13) "non-exhaustive list[s] of types of content from the specification," such as the above—and encompasses the specifications' many cited references to "content." *See* JCCPS (ECF No. 46-1) at 2. This definition is a broad definition, it is not limited to a list of content types, and it does not read a dependent-claim limitation into the independent claims.

Teso's proposed definition also avoids a possible misreading of '866 Patent Claim 15 that may be implicit in Luminati's argument. As discussed in more detail below, Claim 15 first posits "*a* content" in its preamble, then begins with "the step of partitioning *the* content into a plurality of content slices," then states the final "step of constructing *the* content from the received plurality of content slices." But Luminati's "plain and ordinary" positions may seek inexactness as to "the content"—which, defined per the specification as Teso proposes, may precisely be the subject of the claimed "partitioning" into content slices (all such content being inherently divisible down to its very 1s and 0s). And so defined, the content may precisely be the subject of the claimed "constructing" of the content from such content slices, as per the claim, to ensure that "the content" of the first step of the method is the same "content" in the last step of the method, with no detriment from the intervening "partitioning" and "constructing."

## E.  "Identifier" ('044 and '866 Patents) (Br. § VI.C)

The dispute here is whether "identifier" should have a plain and ordinary meaning, or should be construed as "IP address that identifies the device or server," as Teso proposes.

Luminati's brief avoids the crux of the problem: the asserted claims expressly require that the device identifiers identify a device "**in the Internet**."[6] But Luminati's "plain and ordinary" construction conceivably encompasses anything that may identify a device—for example, internally in a given database—without regard to whether the information identifies a device in the Internet. This is wrong because the claims (and written description) require identification "in the Internet." This is why Teso has proposed an IP address, which identifies devices in the Internet.[7]

The intrinsic evidence cited by Luminati for "device" in the JCCPS is noteworthy for the repeated and consistent manner in which the patents-in-suit refer to the IP address as the identifier of a device or server (setting aside URLs that identify content, as discussed below) so that the device may be identified in the Internet.[8] *See* ECF No. 46-1 at 4. If Luminati asserts that the patents disclose an Internet identifier of a device other than an IP address, it presumably would have cited to the disclosure in its brief. Instead, its brief is filled with references to URLs or identifiers of content—irrelevant for the reasons discussed below—or extrinsic evidence that refers to identifiers that are not Internet identifiers, and thus irrelevant to this claim term.

Luminati's claim differentiation argument for Claim 44, an unasserted claim, does not change the outcome. Claim 44 depends from Claim 1 and further limits all identifiers (both device and content) to be Internet identifiers—either IP (device) or URL (content) identifiers. This is not a meaningless claim limitation because, while Claim 1 requires the devices to be "identified in the

---

[6] *See, e.g.*, '044 Pat. Claim 81 ("by a first device, identified in the Internet by a first identifier" and "a second server identified in the Internet by a third identifier"); '044 Pat. Claim 108 (same); '866 Pat. Claim 15 ("a first server identified in the Internet by a second identifier").

[7] Luminati's citation to *Aloft Media* (Br. at 11) is not relevant to the facts of this case, where Luminati's patent claims themselves require a certain kind of "identifier": one that identifies in the Internet.

[8] *See, e.g.*, '044 Pat. at Fig. 5a, Fig. 15, 61:67-62:2 ("The first identifier may be the first server IP address, the second identifier may be the second IP address . . .").

Internet" by their identifiers, it only requires the first content to be "identified by a first content identifier." Claim 44's further restriction of all identifiers to Internet identifiers thus makes sense.

Teso must also clarify a confusing point raised in Luminati's brief. Luminati argues that (i) "identifier" in the claims describes content, not just devices, (ii) content is identified by URLs, and (iii) Teso's identification of IP addresses as the "identifier" therefore is incorrect since at least URLs can also be identifiers. Br. at 12. This is incoherent because the parties are separately construing the term "content identifier," which concerns the identification of content, as opposed to devices. *See, e.g.*, *id.* at 14. To clarify any confusion, Teso construes "identifier" only as it modifies devices/servers in the claims (i.e., the "first identifier," "second identifier," "third identifier," "fourth identifier," and "fifth identifier"), not the "content identifier," which is separately construed by the parties and separately addressed in Luminati's brief.

Notwithstanding the patents' repeated references to IP addresses as device identifiers, Teso is amenable to a construction that includes more than IP addresses *so long as the identifier identifies the device or server "in the Internet" as required by the claims*, and does not consist of an "internal" or other identifier that does not identify a device "in the Internet."

### F.      "Content identifier" (Br. § VI.E)

The dispute here is whether "content identifier" should have a plain and ordinary meaning, as Luminati proposes, or be defined as "an identifier, such as a URL, that identifies the content." Luminati first asserts that "identifier" has already been construed and need not be construed again (Br. at 14), but this argument is misplaced for the reasons given above for "Identifier." The patent claims refer to two types of identifiers: identifiers of devices/servers, and identifiers of content. The former type of identifier is addressed above with respect to "Identifier."

The dispute here is narrow. Teso does not seek to restrict a content identifier to a URL, which is just an example, as Luminati correctly notes. Br. at 15. The key part of Teso's proposed

13

construction is the word "the," as in "the content." Teso is concerned, including from its review of Luminati's brief, that Luminati intends to tell the jury that a "content identifier" is an "identifier of content"—*any* content. This could be confusing to the jury because the '044 Patent (i) in the preamble requires the "first content identifier" to identify the "first content" and then (ii) states in the method steps that the second request includes a "first content identifier."[9] In other words, the "first content identifier" needs to identify specific content—the "first content"—and cannot just be an identifier of any content. Teso's proposed construction simply includes "*the* content" instead of "content" to more accurately define the term in view of the claim language.

## III.    '866 PATENT INDEPENDENT CLAIM TERMS AND INDEFINITENESS

Per Luminati, the "'866 Patent [is] directed to partitioning of content into content slices for use with intermediate devices." Tutorial at 4. The claims of the '866 Patent asserted here suffer from many of the same defects as discussed above with respect to the '044 Patent.

### A.    "Content slice" / "Partitioning" (Br. §§ VI.J, VI.L)

Claim 15 of the '866 Patent includes "the step of **partitioning** the content into a plurality of **content slices**, each **content slice** containing at least part of the content" and "the step of constructing the content from the received plurality of **content slices**." The issue, then, is whether "partitioning" a content must be understood as resulting in "content slices" such that the content may also be constructed from those "content slices." The language and steps of Claim 15 require this. Accordingly, "**partitioning**" properly means *splitting the content in parts, such that the original content can be reconstructed from the parts*, and "**content slice**" means *a part of the content, created by partitioning the content and useable with other partitioned parts to reconstruct the content*.

---

[9] '044 Pat. Claims 81 and 108.

In a generalized context—say, the 'partitioning' of a blueberry pie between John and Jane—a 'slice' may refer to either of two different concepts. In one sense, a 'slice' may refer to a part of the *pie itself*. In this sense, perhaps Jane may observe, "that 'slice' is ruined because a fly landed on it." She means there is a problem with the bit of pie itself in the slice that the fly landed on. But in another sense, a "slice" may just as easily refer to an *area or shape* that delimits or identifies some of the pie. In this other sense, John may observe, of a smaller slice, that "this 'slice' is unfair"—he is complaining about the area of the "slice," not the bit of pie within the "slice."

Or consider if the pie is instead filled on one side with blueberry filling, but on the other side with strawberry, then cut into eight perfectly regular, geometrically-identical slices. John might ask: Is every slice the same? And Jane could answer "yes" or "no" with equal truth—in different senses of the word "slice."

But for the '866 Patent, if "content slice" can reasonably mean either "the content within an area" or "an area of content" or if it can mean different things in the first step of the method ("partitioning the content into a plurality of *content slices*") and in the next-to-last step ("constructing the content from the received plurality of *content slices*"), then the method is indefinite.

Claim 15, however, offers two important clarifications. *First*, as part of the "partitioning" step, each of the "content slices" is specified as "*containing* at least part of the content"—not delimiting, corresponding to, or identifying, but *containing* part of the content. If a "content slice" meant *identifying* rather than *containing* content, the patentees would have so stated.[10]

*Second*, the claim refers to "the step of constructing the content from the received plurality of content slices." That is, the "content slices" must be something that may themselves be received,

---

[10] Compare the patentees' choice of claim language, "each content slice *containing* at least part of the content," with the immediately following limitation that each content slice is "*identified* using a content slice identifier." '866 Patent at 173:46-48.

and from which "the content" must be constructed. A "content slice" that does not contain a part of actual content—that is not a "content slice" in the sense of comprising a literal part of the *content itself*—cannot be received and then constructed into "the content" referenced in the first step of the method where "the content" is partitioned.

Luminati argues that "[p]artitioning merely involves the division of requested content into partitions corresponding with its parts." Br. at 23. Luminati suggests that the result of "partition-ing" the content is "partitions" of the content, which unclaimed "partitions" then *correspond* to, but implicitly *may not be identical with or contain*, the actual "parts" of the content. This shift in framing is erroneous, as it attempts to open the construction of "content slices" back up to the error (as above) of the slices merely identifying or *corresponding to* the actual content.

Luminati also proffers a definition—not of the verb "partitioning," as claimed—but of the *noun* "partition," which is not claimed. Br. Ex. H at 2. Here again, Luminati wants "partitioning" into "content slices" to encompass not only the *parts of the content itself* (or "content parts," as Luminati points to in the specification's language[11]) into which the content is partitioned, but also the *partitioning scheme by which* the content is partitioned.[12] But only the former is claimed.

By way of analogy, Luminati seeks a construction that could encompass "partitioning" a book into "content slices" based on the book's table of contents by itself: the book (the content) is "partitioned" into a "content slice" corresponding to chapter 1 or chapter 2, and so forth, but with-out regard to the *underlying text* of the book itself (the full "content"). But of course, one could

---

[11] Luminati argues: "The specification also states, 'All the components of the first content may be included in all the **content parts**' (['866 Patent], 63:56-58) and 'Two or more **content parts** may be identical and contain the same data.' *Id.*, 63:62-63." Br. at 21.

[12] The '866 Patent specification elsewhere discloses (in a portion cited by Luminati in the JCCPS at 7) the use of a "partitioning scheme," in the context of another method for a "dictionary-based compression scheme." '866 Patent at 68:66-69:27.

not then "construct" the book from such conceptual "slices"—one would need the full book or a very different set of "slices" that actually contained the underlying *content* of the book.

The issue arises particularly here because Claim 15 purports to claim a "method for fetching a content over the Internet from a first server . . . ," which nevertheless requires the (unidentified) device doing the partitioning to already possess the content in advance of the partitioning. But that somewhat circular method is what the patentees actually claimed: a first step of "partitioning the content into a plurality of content slices," followed by a step of "receiving" each of the content slices (from an unspecified source), followed by a step of "constructing the content from the received plurality of content slices." This ordering is confirmed by Luminati's own expert who opines that "'a first request including a content slice identifier' would **necessitate that the requested content had already been partitioned into content slices**.'" Rhyne Decl., ¶ 16.[13]

And despite Luminati's assertions that "[t]he term content slice does not require reconstruction" of the content, that "[a] content slice . . . need not be reconstructed," and that "[t]here is no reconstruction requirement," Br. at 21, 28, Luminati's own expert proves Luminati wrong, attesting that "in my opinion **a POSA would understand the term 'constructing the content' to be consistent with the plain and ordinary meaning of reconstructing the original content** from the 'chunks'[14] of content that had been received." Rhyne Decl., ¶ 17.

---

[13] Not quoted above is Dr. Rhyne's conclusory and unsupported assertion that the preamble of Claim 15 is not limiting (which issue Luminati did not assert for construction). Luminati in fact proposed constructions for terms in the preamble of Claim 15, and in any event this preamble is limiting for much the same reasons as the preamble of Claims 81 and 108.

[14] Luminati's brief and its expert both appear to treat "content slices," "content parts," and "chunks" interchangeably. In particular, Dr. Rhyne's reliance on specification language about "chunks" to opine as to "content slices" further supports that "content slices" are content, not identifications of content, as "chunk" has a literal connotation as an actual piece of something.

As such, the "plain and ordinary" meaning (to the extent there is any such definite mean-ing)[15] of "partitioning" and of "content slices" is insufficient here. Teso's proffered constructions are appropriate, and capture the claim language's sense and manner of use of the terms.

Luminati takes no issue with the use of "part"[16] in Teso's proposed constructions, but in contesting the use of "splitting" appears to have ignored the specification's own use of "splitting" content into "slices."[17] Luminati complains about whether the permissible length, the sequential vs. non-sequential nature, the overlapping vs. non-overlapping nature, partitioning not involving a change in the content, etc. as to "content slices" are improperly limited by the above constructions. Br. at 21-23. Teso has no objection to reasonable supplementation of the above constructions of "content slice" and "partitioning" to expressly state that those terms, respectively, may have char-acteristics as provided in the specification language (and any appropriate context language thereto) as cited in those two sections of Luminati's opening brief.

Finally, Luminati complains that these constructions do not "capture" that "'[a]ll of the components of the first content may be included in all of the content parts' (63:56-58) and '[t]wo or more content parts may be identical and may contain the same data.' (63:62-63)." Br. at 21-24. Teso disagrees. If *all* of the content may be included in each of *multiple* slices of the content, then that would not be a "plain and ordinary" meaning of "partitioning" or of "content slices," but of

---

[15] Luminati offers no evidence to support whether or how a POSA would understand a plain and ordinary meaning of either "partitioning" or "content slice."

[16] Luminati concedes that "[a] person of ordinary skill in the art would understand a content slice to be a part of a content, such as for example a webpage within a content composed of multiple webpages or a file within a content composed of multiple files." Br. at 23. This concession supports Teso's constructions of "content slice" and "content."

[17] The specification states that "[a] **splitting** of a message or a content into **slices**, and transferring each of the slices over a distinct data path is described in U.S. Patent Application No. 2012/0166582 to Binder." '866 Patent at 32:9-14 (which appears consistent with the later use in the patent of "slice," as well as the use of the term in the patent's abstract).

*duplicating*. One cannot 'partition' a blueberry pie (or even a digital photograph of a pie) into two "slices" of the pie that each have the whole pie in them—not in any plain or ordinary sense of the words. Luminati has here argued itself out its own "plain and ordinary" position.

### B.      "Constructing" (Br. § VI.M)

For "constructing," there is no substantial issue in dispute beyond those raised as to "partitioning" and "content slices." The pertinent concept is that this method step starts with the "content slices" and, from them, constructs "the content." Teso's construction, "assembling or combining a set of partitioned parts into the original content," appropriately captures this meaning.

Luminati acknowledges that "the step of 'constructing the content from the received plurality of content slices' means what it says, which is to put together the content from the [content] slices." Br. at 24. But Luminati then asserts that "put[ting] together" and "arranging" are acceptable, but that "assembl[ing]" and "combin[ing]" are not. *Id.* at 24. Luminati contradicts itself by pointing to a (non-technical) definition (1 of 3 in Br. Ex. I) of constructing: "to make or form by **combining** or arranging parts or elements." Br. at 24. Luminati thus insists that the meaning of "constructing" be something different than its *own* extrinsic definition, but offers no construction of its own.

Luminati also argues that "[t]he construction can be the receipt and presentation of slices that themselves have a complete content." Br. at 24. Luminati here confirms that *slices themselves* are *content*, thus supporting Teso's constructions of "partitioning" and "content slices," above. And by arguing that "constructing the content" can mean something like "presenting content slices that themselves have a complete content,"[18] Luminati also highlights the indefiniteness of

---

[18] The "receipt" aspect of Luminati's definition here is superfluous in light of the context: "constructing the content from the received plurality of content slices."

"constructing the content" (discussed below) because Luminati fails to offer any cogent explanation as to how "presenting" could fall within the claim term "constructing."

### C.     "Client device" (Br. § VI.N)

Upon review of Luminati's brief, Teso has revised its proposed construction of "client device" to better address the dispute in a manner consistent with the intrinsic evidence. Accordingly, "client device" should be construed as "a device signed in as a client, and which uses tunnel, agent, or peer devices serving as intermediate devices to fetch content in the method."

Luminati argues that the meaning of "client device" "is not restricted to the 'typical' case" of a "client," and that even referencing what a "client 'typically' does" renders matters ambiguous. Br. at 25. But if "client device" cannot be limited to the typical understanding of "client," and instead must extend to atypical understandings, then the plain and *ordinary* meaning will not do.

Rather, in the sense in which "client" and "client device" are used in Claim 15, and as used throughout the patent (wherever not qualified as being used in the server/client sense), "client device" is a *role* a device plays in a method. Luminati's own intrinsic evidence shows exactly this: "Any network element in the system may be a dedicated **device** that assumes only a single **role**, and thus being only a **client (using tunnels)**, a tunnel, a **client (using agents/peers)**, an agent, or a peer device . . . [or] two or more roles . . . from **the list of roles**[.]" '866 Patent at 125:33-46 (*see* JCCPS at 10). The patent's Abstract confirms this meaning, reciting in the first sentence that "[a] method for fetching a content from a web server **to a client device** is disclosed, **using tunnel devices** serving as intermediate devices."

In response to Teso pointing out the lack of disclosure as to "how the 'partitioning' is done with respect to the claimed methods or *what device does the partitioning*," Dr. Rhyne expressly points to "Fig. 23 and associated text." Rhyne Decl., ¶¶ 14-15. Fig. 23 does indeed show what device does the partitioning—the device that signs in at the start as the "Client":



Fig. 23 (excerpted). Figure 5b, which Dr. Rhyne reproduces, is even blunter about the roles of the various devices (and Dr. Rhyne interprets the "CLIENT DEVICE," "DATA SERVER," "TUNNEL DEVICE," and "ACCELERATION SERVER" roles in the context of Claim 81):



Fig. 5b (excerpted); Rhyne Decl., ¶ 9.

Further, the chart in Figure 5a—which Dr. Rhyne again specifically calls out as informing a POSA—actually lists a chart column called "TYPE," in which five specific devices are each assigned a type (or role) of "Tunnel," "Client," or "Client / Tunnel." Rhyne Decl., ¶ 12 (and reproducing Fig. 5a in full). The patent explains of Figure 5a: "The database 40 shown in FIG. 5a is illustrated as a table, wherein a first column 41a (designated as 'TYPE') relates to a **device functionality, such as tunnel or client**[.]" '866 Patent at 83:54-57. In fact, Luminati's tutorial points to and reproduces Figure 10 of the patent as showing for the '866 Patent, in Luminati's words, "the use of three proxy devices (Tunnel #1 - #3) to fetch the partitioned content," while the patent further explains that "FIG. 10 illustrates schematically a simplified flowchart of a method relating to a **client device** using multiple tunnel devices." Tutorial at 19; '866 Patent at 78:39-41.

Additionally, if "client device" were to be construed (incorrectly) as merely indicating that a device is a client in the "server/client architecture" sense also discussed in the patent, then the limitation of Claim 15 that "wherein each of the devices in the group is a client device" becomes meaningless. The specification makes clear that, as used in the patent, *any* device not denoted by

21

the patent to be a server "may typically function as a client in the meaning of client/server architecture." '866 Patent at 119:34-42; *see also* JCCPS at 10 (citing *id.*). That is, according to the patent, anything not a server can be a client in the client/server sense—meaning that the limitation "wherein each of the devices in the group is a client device" is both indefinite and a nullity if "client device" is given a "plain and ordinary" construction that includes the client/server sense.

As such, it is clear from the patent that "client device" is a *role* or *function* in the methods, whereby the device in the (or a) "client" role in the method is signed in as client and uses intermediate tunnel, agent, or peer devices to fetch content. Accordingly, "client device" should be construed as "a device signed in as a client, and which uses tunnel, agent, or peer devices serving as intermediate devices to fetch content in the method."

### D.     The claim terms "partitioning the content" and "constructing the content" are indefinite (Br. § VII.C)

For the reasons discussed extensively above, Claim 15's steps of "partitioning the content" and "constructing the content" lose any chance at definiteness if "content," "partitioning," "content slice," "constructing," and "client device" are not construed consistently with Teso's proposals. Luminati's only counterargument is a reference to its earlier arguments about construction and a facile (and flawed) assertion that "Defendant itself purports to understand the meaning of these terms in proposing constructions of them, so the terms are not indefinite."[19] Br. at 29-30.

But even if Teso's constructions are applied, substantial indefiniteness issues remain because the claims have multiple potential meanings and fail to define the scope of the invention with reasonable certainty. The indefiniteness concerns here are principally how partitioning and

---

[19] Luminati also asserts that Teso has not "submitted a proper P.R. 4-3 expert disclosure." Br. at 29. Teso has submitted herewith the declaration of its expert as to indefiniteness, which is consistent with Teso's prior disclosure of the same. And, in any event, the indefiniteness of the terms herein is apparent from the face of the claims and specification, even without such declaration.

constructing are done (the claims do not say), what device(s) does or do the partitioning and con-structing (the claims do not say), and most particularly, how the limitation "wherein each of the devices in the group is a client device" relates to the partitioning and constructing steps (again, the claims provide no guidance). Dr. Rhyne purports to answer the "how the 'partitioning' is done" and "what device does the partitioning" questions solely by reference to Figures 23 and 23a (and the associated text, which he does not discuss at all)—yet those very basic diagrams say nothing at all about "how," and in fact show only one "Client" device but multiple "Chunks Fetch Agent[s]." Rhyne Decl., ¶ 15. Even if it is presumed that these "Chunks Fetch Agent[s]" are the group devices of Claim 15 (which neither Figs. 23/23a nor Dr. Rhyne indicates), the question remains unanswered: How is each of these group devices also "a client device" in the method?

Claim 15 and its dependent claims 16-28 therefore fail to inform a POSA about the scope of the invention with reasonable certainty, and are indefinite. Freedman Decl., ¶¶ 20-22.

### E. "Group device identifier" / "Content slice identifier" (Br. §§ VI.I, VI.K)

"Group device identifier" should mean "IP address of a device in the group," for the same reasons as explained above with regard to "identifier."

In view of the issues already raised regarding "content" and "content slice," and Teso's review of Luminati's arguments, Teso believes that it is unnecessary to construe "content slice identifier." Teso accordingly withdraws its proposed construction, and agrees that "'content slice identifier' has its plain and ordinary meaning of an identifier of a content slice." Br. at 22.

## IV. DEPENDENT CLAIM TERMS AND INDEFINITENESS

### A. The claim term "past activities" is indefinite (Br. §§ VI.G, VII.B)

Claim 99 of the '044 Patent requires the second device to be selected "based on past activi-ties." This term is extraordinarily broad and provides no guidance whatsoever regarding the scope

of the claim. The indefinite scope of the term is compounded by Luminati's insistence that it could also encompass "lack of activity in the past." Br. at 19.

If one were asked to base any decision on "past activities," the request would be unintelligible absent further information. For example, if one is asked to choose a home to purchase based on "past activities," the considerations would have no bounds and could include one's past earnings or prior residences; the date the home in question was built or the construction methods; past tax assessments; the occurrences (or lack thereof?) of crime in the area; the landscaping, or the paint color, or the lack thereof; or any other number of undefined "activities."

The specification of the '044 Patent does not provide any further guidance (and Luminati does not cite to the specification for any). Although it is unclear, Luminati appears to suggest that "past activities" may equate to the "timing of an event" referenced in Claim 100. Br. at 19. If this is what Luminati argues, it is contrary to the patent because the specification refers to these phrases three times as being different, stating that the second device may be selected "based on past activities, _or_ based on the timing of an event."[20] Luminati's use of "based on past activities" fails to inform a POSA of the scope of Claim 99 with reasonable certainty. Freedman Decl., ¶ 19.

### B.      "The timing of an event" ('044 Patent) (Br. § VI.H)

Claim 100 recites the second device being selected based on "the timing of an event." The reference to "an event" is vague, because "an event" could conceivably apply to everything in the world that has happened to date. Teso attempts to construe this term in accordance with support from the specification to preserve validity, and proposes a definition of "time of sign in of a tunnel device, time of last usage of a tunnel device, or time of accumulated use of a tunnel device."

---

[20] '044 Pat. at 58:25-30, 59:24-26, 63:8-11.

As Luminati's expert admits, the patent specification refers to the "second device" as a "tunnel device." Rhyne Decl., ¶ 9. The '044 Patent includes a description at 91:26-44 which contains the heading "Timing:" and describes how, "[i]n one example, the timing of an event or activity of a tunnel device affects its selection." The passage goes on to describe the items that are incorporated into Teso's proposed construction. *Id.* Luminati's citation to 53:65-54:4 is less clear because it vaguely refers to events that include "last communication[s]" and does not make clear what exact timings the claim references. *See* Br. at 20.

## C.    "Simultaneous" / "Concurrently" ('044 Patent) (Br. § VI.F)

The dispute is whether both terms have a plain and ordinary meaning, or whether "simultaneous" means "at the same time" and "concurrently" means "in overlapping time periods."

### 1.    "Simultaneous" (Br. § VI.F)

Luminati professes confusion about what is meant by "at the same time." Br. at 16. It is incongruous to say that simultaneous has a plain meaning, but that "at the same time" is confusing. Luminati, in its own extrinsic evidence in the JCCPS, cites dictionary.com for the following definition of simultaneous: "existing, occurring, or operating **at the same time**; concurrent." ECF No. 46-1 at 3. Setting aside the issue of whether "concurrent" should mean the same thing as "simultaneous"—which is discussed below—this shows that Luminati recognizes the accuracy of "at the same time" as a definition of "simultaneous."

The real issue seems to be Luminati's belief that "simultaneous" may refer to two events "occurring **at least in part at the same time**." Br. at 16. This argument is unreasonable and unsupported by Luminati's own dictionary definition. Luminati's definition would mean, for example, that a United States Senator who served from 1973-1989 would have served a "simultaneous" term with another Senator who served from 1988-2010 because they served in part at the same time, in 1988-1989. This cannot be correct.

25

The claims in question, Claims 85-86 of the '044 Patent, require the sending of the first content identifier to the second server using the third identifier (step (f) of Claim 82) to be "simultaneous with steps (d)-(e)." Notably, this is contrasted with Claims 83-84, where step (f) is "preceding step (d)" or "following step (e)." The claims therefore establish that the timing of step (f) with respect to steps (d)-(e)—whether before, after, or "simultaneous with"—is noteworthy. Given this stated importance, Luminati cannot nullify the "simultaneous" limitation by arguing that a partially overlapping occurrence of events means that they are "simultaneous."

The patent specification points out that "[m]ultiple roles may be implemented at different times, or simultaneously using multiprocessing or multitasking," therefore emphasizing the difference between "at different times" and "simultaneously" (at the same time).[21] The specification further refers to an element assuming two or more roles "either at different times or simultaneously" and a server serving as two servers "either simultaneously or at different times."[22]

## 2. "Concurrently" (Br. § VI.F)

The Court should reject Luminati's attempt to equate the meanings of the terms "simultaneous" and "concurrently." Instead, as Luminati concedes in its brief, "concurrently" commonly refers to "overlapping time." Br. at 18. That is how the Court should construe it.

Claims 85-86 refer to the newly claimed step (f) being "simultaneous" with steps (d)-(e) while Claim 88 refers to the newly claimed steps (f)-(h) of Claim 87 being "executed concurrently" with steps (d)-(e). This does not indicate an intent to use two different terms to mean the same thing; instead, it shows an intent to emphasize two different timings. The same is true of Claims 90, 91, and 107, which recite steps being "executed concurrently" with prior steps. The apparent

---

[21] '044 Pat. at 106:1-3.

[22] '044 Pat. at 122:31, 122:37-38.

reason for this difference is because the claims that recite "concurrently" depend from claims 87, 89, or 101, which add new devices that send or receive new requests for content.[23] One may expect such additional communications with new devices for new content to occur concurrently with—or in overlapping time periods with—the content request in Claim 81, and not at the same time.

This is contrasted with Claims 85-86, which concern the timing of step (f) of Claim 82. Claim 82's step (f) refers to the sending of the first content identifier to the "second server," which was already identified in Claim 81 via the "third identifier." It therefore does not add communications with new devices beyond those recited in Claim 81, such that the claim recites simultaneous actions rather than concurrent actions.

Luminati's quotation from the '044 Patent at 73:8-11 supports Teso's position, not Luminati's. Br. at 17. *First*, Luminati's quotation refers to two schemes *operating* concurrently but *activated* simultaneously. *Id.* "Concurrently" and "simultaneously" therefore modify two different actions, such that the claim does not refer to the "exact same operation" as Luminati states. *Second*, Luminati uses ellipses to remove a pertinent portion of the quoted sentence, which reads in full as follows: "In such a case of simultaneous activation of both schemes, upon receiving the first piece of data by one of the schemes, and **if the other scheme is still active**, that other scheme is terminated."[24] In other words, even though the schemes are simultaneously activated, one scheme may have ended earlier, such that the schemes run concurrently, in overlapping time periods.

Under the ordinary principles of claim differentiation, the Court should not accept Luminati's invitation to conflate the meaning of these two terms. *See Seachange Int'l, Inc. v. C-COR,*

---

[23] *See* Claim 87 ("receiving the fourth identifier" of a third device and sending a "third request"); Claim 89 ("receiving the identifiers of the group devices" and sending a "third request"); Claim 101 ("receiving a third request from the third device" and receiving "second content" from the "third server").

[24] '044 Pat. at 73:11-14.

*Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) ("The doctrine of claim differentiation stems from 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'").

### D.   "Part of the content included in two or more content slices" ('866 Patent) (Br. § VI.O)

Luminati's construction of "part of the content included in two or more content slices" is unnecessary, particularly in light of the constructions of "content" and "content slices" proposed by Teso. Teso notes, however, that as discussed above, Luminati's focus on this claim term merely highlights the need for careful constructions of "content," "partitioning," "content slices," and "constructing," as well as the indefiniteness issues that are nevertheless threatened by the "constructing the content" and "partitioning the content" steps of the asserted claims of the '866 Patent.

## V.   TERMS SUBJECT TO TESO'S MOTION FOR LEAVE

Teso filed a motion for leave (ECF No. 69) to address certain additional issues, and hereby includes brief argument on those terms for the Court's consideration if the Court grants the motion.

### A.   Limiting Preamble as to Claim 108

Claim 108's preamble is limiting for the same reasons as explained above for Claim 81. It includes the same important limitations regarding the relationship between the recited devices and servers. Further, the preamble of Claim 108 also provides antecedent basis for the terms noted for Claim 81, with one difference: while "the second device" is not recited in Claim 108, "the first device" is recited and has antecedent basis provided in the preamble.

### B.   Indefiniteness of "from a second server," "by a first device," "via a second device," and "using a first server" for Claim 108

These terms are indefinite just as the identical terms are indefinite in Claim 81, for the reasons explained above. Their usage in Claim 108 only adds to the confusion. "[B]y a first device"—which was not recited in the body of Claim 81 yet was presumed by Dr. Rhyne to perform

28

each of the steps of Claim 81—is recited in the body of Claim 108 yet appears not to perform each of the method steps. For example, Claim 108's step (b) recites "receiving a second request from the first device," which means that the first device presumably does not receive the request from itself.

Like Claim 81, Claim 108 does not explain how the required servers and devices interact. While the "second server" is recited in the body of Claim 108, the "second device" is not, yet the claim requires the receipt of content "via a second device." Claim 108 provides no explanation of how the second server and second device interact (if at all) to provide the first content.

The "first server" is recited only once in the body of Claim 108, in step (a) when it receives the "second identifier." Yet the preamble makes clear that the first content must be fetched "using a first server." The same questions about the role of the "first server" previously discussed with respect to Claim 81 are present with Claim 108.

## C.      "Sending a first request"

Claim 81's step (b) recites "sending a first request" to the first server. Unlike step (d), which recites what the *second* request must include, there are no details regarding the "first request" except that an unnamed component sends a request to the first server. This term needs to be construed; otherwise, it could presumably cover any type of "request." According to Luminati's expert, the "first request" appears to be the first device's request for a list of devices from the first server. Rhyne Decl., ¶ 9 (step 56c of Fig. 5b). The written description confirms that step 56c occurs "where the [client] requests the list of the available tunnels that may be used, from the acceleration server." '044 Pat. at 82:64-83:1. It makes sense in the context of the claim steps that the "first request" seeks the identification of the tunnel, or "second device," because the next step (c) of Claim 81 recites receipt of the second identifier which identifies the second device.

Teso accordingly proposes that "sending a first request" be construed as "sending by the first device of a request for the identifier of the second device."

## VI.   CONCLUSION

Teso respectfully requests that the Court find indefiniteness and construe the claims as discussed above.

Dated: June 26, 2019

Respectfully submitted,

MICHAEL C. SMITH
  Texas State Bar No. 18650410
  michaelsmith@siebman.com
**SIEBMAN, FORREST,**
**BURG & SMITH LLP**
113 East Austin Street
Marshall, Texas 75670
Telephone: (903) 938-8900
Telecopier: (972) 767-4620

PAUL S. TULLY, PH.D.
  tully@mbhb.com
KURT W. ROHDE
  rohdek@mbhb.com
ANDREA K. ORTH
  orth@mbhb.com
**MCDONNELL BOEHNEN**
**HULBERT & BERGHOFF, LLP**
300 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 913-0001
Telecopier: (312) 913-0002

STEVEN CALLAHAN
  Texas State Bar No. 24053122
  scallahan@ccrglaw.com
CRAIG TOLLIVER
  Texas State Bar No. 24028049
  ctolliver@ccrglaw.com
C. LUKE NELSON
  Texas State Bar No. 24051107
  lnelson@ccrglaw.com
**CHARHON CALLAHAN**
**ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

*Counsel for Defendant UAB Teso LT*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on June 26, 2019. As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A).

STEVEN CALLAHAN